**TEXAS–NEW MEXICO RY. CO. v.
BAILEY et al.**

**No. 14197.**

United States Court of Appeals
Fifth Circuit.

April 23, 1953.

Hill D. Hudson and John F. Tomlin,
Pecos, Tex., for appellant.

Leo Brewster and Arthur Lee Moore,
Fort Worth, Tex., George Finley, Kermit,
Tex., Roberson & Finley, of Kermit, Tex.,
Brewster, Pannell, Leeton & Dean, Fort
Worth, Tex., for appellees.

Josh H. Parr, Odessa, Tex., for intervener.

Before HUTCHESON, Chief Judge, and
HOLMES and RIVES, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from a judgment entered
upon the verdict of a jury awarding damages for personal injuries suffered by the
appellee Bailey, his wife, and their minor
son in a collision between an automobile
driven by Bailey and an oil tank car in a
train of the appellant railway company.
The collision occurred about 9 o'clock at
night on January 29, 1951, at a place
where a railway spur track crossed Highway No. 82 about five miles north of the
city of Kermit in Winkler County, Texas.
The theory upon which the case was submitted to the jury was that at the time of
the collision the crossing may have been
so extrahazardous as to require unusual
precautions.[1]

---

1. The court charged the jury as follows:
"You are instructed that in order for
the plaintiff to recover it must be established by a preponderance of the evidence
that the conditions surrounding the
crossing in question at the time of the
collision were such as to render that
crossing more than ordinarily dangerous,
and that such fact was known to the
members of the railroad crew on the
train in question, or should have been
known to them by the exercise of ordinary care. A crossing is more than ordinarily dangerous if its condition is such
that a reasonably prudent person could
not, by the exercise of ordinary care, use
the same with safety unless the railroad

employs means to give warning of the
presence of a train on the crossing.
"It is not necessary that the crossing
be more than ordinarily hazardous at all
times. Conditions surrounding a crossing may, and do, change materially from
time to time. A warning of the presence of a train on a crossing might not
be required under the law at one time,
and yet it might be negligence to fail to
provide one there at another time. The
question for your determination is
whether or not at the time of the accident the conditions surrounding the
crossing in question rendered it more
than ordinarily hazardous or unusually
dangerous."

The principal question presented on this appeal is whether the court erred in refusing to direct a verdict in favor of the defendant.

The Baileys left Kermit about ten minutes before the collision, going in a northerly direction and bound for their home in Santa Fe, New Mexico. The windows of the car were up and the radio was playing. The speed of the car was variously estimated at from 30 to 55 miles per hour. The driver testified that the highway appeared to him to be open and unobstructed until he saw the oil tank car on the crossing only 40 or 50 feet ahead of him. He applied his brakes but could not bring the automobile to a stop before the collision. The oil tank car was one of a continuous string of tank cars extending on both sides of the paved portion of the highway for some distance and standing still at the time of the collision.

There was evidence that Highway No. 82 was frequently traveled day and night between the Permian Basin section of West Texas and New Mexico. The highway was straight and level for approximately a mile before reaching the crossing. The main line railroad track and the highway ran parallel to each other in a general northerly and southerly direction with the railroad track about 120 to 150 feet west of the highway. The only trains that regularly passed over the railroad track were two freight trains each day, one going in each direction.

The spur track was about a mile and a quarter long and served only the Cabot carbon black plant and the Richardson loading rack. There was a switch on the spur track at a point about 750 feet east of the highway (on the opposite side from the main line track) where the right branch went to the Richardson rack, a little over 1000 feet east of the highway, and the left branch went to the carbon black plant, about one-half or three-quarters of a mile beyond.

The Diesel locomotive left its train standing on the main line and backed over the spur track across the highway to the Richardson loading rack to get a string of loaded cars. The crew had instructions to line up the cars according to whether they went east or west on the Texas & Pacific Railway main line when they reached Monahans, Texas. This required a switching operation over the highway crossing. Just prior to the collision, the locomotive had pulled a string of twenty-two cars from the Richardson rack until the brakeman on the last car gave the stop sign when it had cleared the Richardson switch. The locomotive was then almost at the junction of the spur track and the main line with its headlight shining down the main line. The engineer had just received, but had not acted on, the relay of the signal from the brakeman to back up when the collision occurred.

The oil tank cars were from 40 to 50 feet long and the one with which the automobile collided was stretched entirely across the black top or paved portion of the highway. The cars were dark in color, about the same color as the black portion of the highway, and the shape and color were such that they reflected little light from approaching automobiles. The only light on the cut of cars was the headlight on the front of the locomotive. The conductor and the two brakemen each had lighted lanterns in their hands, but there was no member of the crew at or near the crossing at the time of the collision. The night was extremely dark, there was a strong northeast wind blowing and it was very cold. In the vicinity of the crossing caliche dust was being blown by the wind making the atmosphere hazy, but not "what you would call a real bad dust storm".

As the north bound automobile approached the crossing, it passed through a brilliantly lighted section of the highway close by a group of buildings belonging to the Magnolia Petroleum Company. The rays of the lights did not extend quite to the crossing, and there was testimony from which the jury could conclude that the glare of the lights tended to obscure a northbound driver's vision of the crossing.

There was an adequate supply of flares and fusees on the locomotive and the caboose, but none was put out at the cross-

ing until after the collision. There was evidence from the crew that flares and fusees could be and had been used as warning lights to vehicles approaching this spur crossing and other highway crossings up and down the railroad.

Appellee Bailey's mother resided in Kermit and he and the other occupants of the automobile on the trip had stopped for supper and a visit with her. They had previously known of the location of the spur track, but had not been over the highway for three or four years. There was only one railroad cross-arm signal post, and it was on the north side of the crossing, the train being between it and the automobile. There was a highway reflector railroad crossing marker on the shoulder of the highway about 450 feet south of the crossing, but none of the occupants of the automobile saw it. There was testimony from a number of disinterested witnesses, who had traveled the highway at night for some time prior to the collision, that they had never seen this reflector sign until afterwards, but whether the sign was set at the wrong angle to reflect light from approaching automobiles, or what was the reason for its not having been seen by travelers, does not appear.

One of the brakemen testified that the whistle of the locomotive blew about a second before the collision occurred, and the other testified that the automobile was practically at the crossing when the whistle was blown. A stiff wind was blowing in the direction from the automobile toward the locomotive. The conductor, as he expressed it, "was just watching the man hit the train", but he did not remember hearing the whistle blow. The train crew was familiar with the conditions existing at the crossing.

In Missouri K. & T. Ry. Co. of Texas v. Magee, 92 Tex. 616, 50 S.W. 1013, at page 1015, the court quoted with approval the following from Pennsylvania Railroad Co. v. Matthews, 36 N.J.L. 531, 534:

" 'In this narrow aspect the rule laid down was this: That if that particular place was so peculiarly dangerous that prudent persons could not use the public road in safety unless the company employed a flagman or other extraordinary means to signal the approach of their trains, that then, in such event, it was incumbent on them to employ such extraordinary means. And this proposition seems to me to be, in its application to the case then trying, in all respects correct.' "

This statement of the rule was again quoted with approval in Missouri K. & T. Ry. Co. of Texas v. Long, Tex.Com.App., 299 S. W. 854, 855. A number of Texas decisions have settled the principle that the question for determination is not whether a flagman or extraordinary warning signals are necessary at all hours, but whether at the time of the accident the conditions surrounding the crossing rendered it unusually dangerous and required the stationing of a flagman or extra warning lights or signals. Tisdale v. Panhandle & S. F. Ry. Co., Tex.Com.App., 228 S.W. 133, 136, 16 A.L.R. 1264; Gulf, C. &. S. F. Ry. Co. v. Picard, Tex.Civ.App., 147 S.W.2d 303, 307; Missouri, K. & T. Ry. Co. of Texas v. Long, Tex.Civ.App., 23 S.W.2d 401, 402.

The conditions at the time of the collision were different from those in the cases relied upon by appellant in that, as the jury was justified in finding, they did not go either to the one extreme where visibility of all things including even lighted objects was obstructed as much so as was the train,[2] or to the other extreme where there were no conditions of any kind to interfere with visibility.[3]

■ In Texas the test of whether a negligent act or omission is the proximate cause of an injury is whether "the wrongdoer might by the exercise of ordinary care have foreseen that some similar in-

2. Texas & N. O. R. Co. v. Stratton, Tex. Civ.App., 74 S.W.2d 741; Texas & N. O. R. Co. v. Compton, 135 Tex. 7, 136 S. W.2d 1113; Walker v. Texas & N. O. R. Co., Tex.Civ.App., 150 S.W.2d 853.

3. McMahan v. Texas & N. O. R. Co., 138 Tex. 626, 161 S.W.2d 70; and Texas City Terminal Ry. Co. v. Allen, Tex.Civ. App., 181 S.W.2d 727.

jury might result from the negligence". Atchison v. Texas & P. Ry. Co., 143 Tex. 466, 186 S.W.2d 228, 232; St. Louis B. & M. Ry. Co. v. Brack, Tex.Civ.App., 102 S. W.2d 261, 273.

Under the evidence in the present case, we think that it was clearly for the jury to say whether flagging the crossing or putting out warning lights would have operated to prevent the collision, and also whether the members of appellant's railroad crew, with the knowledge of the conditions existing at the crossing, should have reasonably foreseen the necessity of protecting the switching operations by flagging or by putting out warning lights. The district court properly denied the defendant's motion for a directed verdict, and carefully and ably submitted to the jury the issues presented by the pleadings and the evidence. The judgment is therefore affirmed.